**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

NO: 5:04-CV-291-FL(3)


MICHELLE EVANS                                    )

                                                  )

             Plaintiff,                           )

                                                  )

             v.                                   )            **MEMORANDUM**

                                                  )            **RECOMMENDATION**

HOUSING AUTHORITY OF THE                          )

CITY OF RALEIGH N.C.,                             )

             Defendant.                           )

_____

        This Cause comes before the Court on Plaintiff's motion for compensatory damages, attorney's fees, and cost. **[DE-34]**. This matter was referred to the undersigned to issue a Memorandum and Recommendation. **[DE-36]**. The facts are largely undisputed and have been set out in the motions for summary judgment and other pleadings and will not be rehearsed here.  They can be briefly summarized as follows: Judge Boyle granted Plaintiff's Motion for Summary Judgment. **[DE-32 & 33]**.   He found that the Raleigh Housing Authority, hereinafter, RHA, terminated Plaintiff's "Section 8" housing subsidy in violation of the rights secured to her by federal statute and the United States Constitution. Id. The court reinstated Plaintiff's housing subsidy and enjoined RHA  from terminating it on the basis of the previously established record. Id.  Thus, Plaintiff is the prevailing party in this action.

1

<u>**Analysis**</u>

**I.      Compensatory Damages**

As the prevailing party, Plaintiff seeks compensatory damages in the amount of the subsidy she would have received from the time her benefits were terminated on October 31, 2003, until they were reinstated. **[DE-46, pgs. 1-2]**. She calculates the total principal amount of damages as approximately $34,595.65; $1,069 per month, multiplied by the 32 months and 11 days that she was deprived of her subsidy.   **[DE-46, p. 3, DE-63, pgs. 2-3, Pl's Ex. 12]**.  RHA does not challenge Plaintiff's right to recover compensatory damages. **[DE-47, p. 4, DE-55, p. 4]**.  Rather, they dispute the amount of damages to which she is entitled.[1] **[DE-47, pgs. 4-5]**.  Specifically, RHA contends that Plaintiff's recovery should be limited to her actual losses, which, they argue, do not include "the entire amount of [the] housing subsidy that would have been paid on her behalf had her voucher not been terminated." **[DE-64, p. 4]**.

Compensatory damages in this case are governed by 42 U.S.C. § 1983.  In general, the purpose of compensatory damages is to compensate a plaintiff for the injury caused by a defendant's breach of duty.  <u>Carey v. Piphus</u>, 435 U.S. 247, 254-55 (1978).  "A plaintiff in a suit under 42 U.S.C. § 1983 can recover compensatory damages only if he proved actual injury caused by the

---

[1]  In their briefs, both parties discuss whether the amount of Plaintiff's housing subsidy should be changed to reflect her income. [DE-46, pgs. 2-4]; [DE-55, p. 9].  Plaintiff asserts that according to RHA's own administrative procedures, there are two ways the voucher participant reports interim changes which reflect changes in their income or family composition. [DE-46, p. 2].  Recertification is the annual procedure where Section 8 participants submit documentation of their income and other factors.  <u>Id.</u>  Based on this documentation, RHA calculates the amount of rent subsidy for the upcoming year; the last calculation of Plaintiff's subsidy was performed before her benefits were terminated on September 3, 2003.  <u>Id.</u>  This calculation was $1,069.  <u>Id.</u>  In addition, the housing subsidy can also be augmented when the voucher participant reports interim changes which reflect changes in their income or family composition.  <u>Id.</u> at 2-3.  According to Plaintiff, her housing subsidy should remain constant because RHA did not perform the annual recertification and she was not required to report interim changes because her voucher was wrongfully terminated.  <u>Id.</u>  On the other hand, RHA argues that the amount of subsidy that Plaintiff should receive should be governed by the guidelines of the Section 8 voucher program. [DE-55, p. 9].  As a result, Plaintiff would have been under a duty to report the changes in her income, which would have caused her subsidy to be reduced.  <u>Id.</u>  Because this issue is resolved on other grounds, these arguments will not be discussed further.

2

denial of his constitutional rights . . . Where no injury is present, no 'compensatory' damages can be awarded." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307-08 (1986) (internal citations omitted).

The parties's arguments are addressed below.

### A. Statute of Limitations

When the RHA terminated Plaintiff's housing subsidy on October 31, 2003, she lived at 7400 Campsite Drive in Wendell[2], North Carolina. RHA had been paying her landlord $1,069 per month under the Housing Assistance Payments Contract, Section 8 Tenant -Based Assistance Housing Choice Voucher Program ("HAP Contract"). (Tr. 30).[3] Plaintiff was responsible for paying approximately $35 per month. Id. The parties disagree as to whether Plaintiff is obligated, under the lease, for the portion of her rent at Campsite Drive previously paid by the RHA. They contend that the answer to this question depends on whether a three or ten year statute of limitations applies.

After the termination of her benefits, Plaintiff and her landlord, Mary Ella Hutchinson, informally agreed that Plaintiff would continue to pay $35 per month "until we go back to court." Id. at 31.[4] At the hearing, on direct examination, Plaintiff testified that she believed she would remain liable for the full amount of the unpaid rent, $1,104. Id. at 31-32. Her landlord testified that this was her understanding of the agreement as well. Id. at 60-61. As a result, Plaintiff now contends that she should be awarded compensatory damages for the entire time period she was deprived of

---

[2]Although the parties refer to Raleigh, the Campsite address is in Wendell, North Carolina. To avoid confusion, Raleigh will be used throughout.

[3] Refers to the transcript from the first day of the evidentiary hearing.

[4] The parties agree that this agreement was never reduced to writing. (Tr. 42-43, 60).

3

her subsidy; November 1, 2003 until July 11, 2006. **[Pl's Ex. 12]**. However, during her deposition,

Plaintiff was asked "Did [your landlord] tell you that at some point you were going to have to repay

the monies if this lawsuit is not successful?" (Deposition Tr. 29). Her answer, "No, she didn't tell

me that." <u>Id.</u>

RHA argues that awarding Plaintiff the total amount of her lost subsidy as compensatory

damages would result in a windfall. **[DE-64, p. 5]**. It points out that "Plaintiff paid no more than

her portion of the rent [$35.00 per month for] the entire time she resided at 7400 Campsite Drive and

that any amounts due under that 'lease' is not a debt that Plaintiff can be forced to pay." <u>Id.</u> This

is due in part, RHA argues, because North Carolina's three-year statute of limitations provides a

viable defense against collection of any portion of the rent due prior to October 1, 2004 **[DE-64, p.

6]**; <u>See</u> N.C. Gen. Stat. § 1-52 (2007). RHA contends that the absence of a new, written, promise

to pay the debt failed to toll the statute of limitations. **[DE-64, pgs. 6-7];** <u>See</u> N.C. Gen. Stat. § 1-26

(2007). As a result, the three year statute of limitations would bar recovery for any debt that was

incurred by Plaintiff prior to October 2004.

Plaintiff counters that the ten year statute of limitations rather than the three year statute of

limitations is applicable because the lease was under seal. **[DE-63, p.10]**. Plaintiff asserts that the

presence of the word "seal" is sufficient to qualify the lease as a sealed instrument and therefore the

ten-year statute of limitations rule should apply. <u>Cameron v. Martin Marietta Corp.</u>, 729 F. Supp.

1529,1530-31 (E.D.N.C. 1990).[5]

There is no need to decide whether the three or ten year statute of limitations is applicable

---

[5] N.C. Gen. Stat. § 1-47(2) states in pertinent part that the ten year statute of limitations applies "[u]pon a
sealed instrument or an instrument of conveyance of an interest in real property, against the principal thereto."

in this case. In addition to the lease, the landlord, Plaintiff, and the RHA were parties to the HAP

Contract. The HAP Contract provides in pertinent part:

> **9.** If the HAP contract **terminates** for any reason, the lease **terminates**
> automatically.
> **10.** If the PHA **terminates** program assistance for the family, the lease **terminates**
> automatically.[6] (emphasis added)

Terminate is defined as "1a: to bring to an ending or cessation in time, sequence, or continuity:

CLOSE . . . b: to form the ending or conclusion of . . . c: to end formally or definitely . . . ."

(examples omitted) Webster's Third New International Dictionary, Unabridged. Merriam-Webster,

2002.

From the forgoing it is clear, once the RHA terminated Plaintiff's housing subsidy on

October 31, 2003, pursuant to the HAP Contract, Plaintiff's lease automatically terminated. Upon

the termination of the lease, Plaintiff and her landlord's obligations under the lease ceased. Thus,

the accrual of damages under the lease, for which compensatory damages could be awarded, ceased

as of that date. Therefore, it is RECOMMENDED that Plaintiff receive no compensation for the

period of time from November 1, 2003 through September 17, 2005 during which she resided at

7400 Campsite Drive.

### B.    Portability of the Housing Subsidy

On  September 17, 2005, Plaintiff moved from Raleigh to Durham. (Tr. 34). Despite the

change of jurisdictions, Plaintiff claims that she is due the amount of her subsidy as damages. **[Pl's**

**Ex. 12]**. RHA contends that while the recipient of a regular housing subsidy could, if she followed

the rules, move to another jurisdiction and retain her subsidy, "Plaintiff's Section 8 voucher is of a

---

[6] [DE-55, Ex. 1, p. 9, ¶¶ 9-10].

unique character" which would have precluded this.  **[DE 64, p 8]**.   The RHA points out that

Plaintiff had a "Welfare-to-Work Voucher." Id.

> The Welfare-to-Work Voucher program originated in 1999 when Congress attempted to address the lack of stable affordable housing available to families attempting to transition from welfare to self-sufficiency. The United States Department of Housing and Urban Development ("HUD") awarded 50,000 Welfare-to-Work Vouchers Section 8 Vouchers to Housing Authorities across the United States. Defendant received 950 of these Vouchers. The Welfare-to-Work Voucher program allowed recipients to bypass the waiting list process and receive immediate housing assistance. (Defendant's waiting list is approximately six years.) In return, the recipients were required to show annual progress towards self-sufficiency and make a successful transition from welfare to economic independence. This program was phased out in March, 2004. Only a limited number of Housing Authorities received allocations of Welfare-to-Work vouchers. Defendant was the only Housing Authority in the area to receive this type of Section 8 Voucher. As such, they are not eligible for porting among Housing Authorities.

Id. at 8-9 (internal citations omitted).

RHA challenges Plaintiff's eligibility for a rental subsidy for the period of time she resided in Durham on two grounds.  First, it asserts that Durham is outside of the jurisdiction where RHA is authorized to provide a subsidy.  Id.  Second, it contends that Plaintiff's participation in the Welfare-to-Work program precluded her from "porting" out her voucher because the RHA was the only housing authority in the area to offer this program. A Welfare-to-Work voucher was not authorized or available from the Durham Housing Authority.(Tr. 72).

RHA concedes that if Plaintiff moved to Durham to find affordable housing, the amount of rent she paid is compensable. **[DE-64, p. 9]**.   However, it challenges Plaintiff's claim for damages incurred as a result of her move to Durham because the move was motivated by convenience.  **[DE-64, p. 9]**.

Plaintiff testified that she moved because of financial concerns and the convenience of being closer to her job.  (Tr. 32-33).  While in Durham, Plaintiff paid $713 per month in rent.  Id. at 32;

6

**[Pl's Ex. 2, p. 1]**. She resided in Durham from September 2005 until April 2006. Id. at 34. She now seeks $6,948.50 in damages; $1069 per month for 6.5 months. Plaintiff argues in the alternative that "[i]f the Court determines that the measure [of damages] should be the subsidy she would have received under the payment standard in Raleigh for a 4 bedroom unit, damages would be $1,495." **[Pl's Ex. 13]**. This would amount to $230 per month for 6.5 months. Id.

In support of its argument, the RHA notes that prior to her move, Plaintiff lived at a residence in which "she had no obligation to pay rent," continued to reside there after she found employment, and was never required to leave by her landlord. **[DE-64, p. 9]**. Defendant also asserts that Plaintiff failed to look for affordable housing options in Raleigh, relying instead on the advice of her friends. Id. As a result, RHA argues that Plaintiff should not be allowed to recover compensatory damages arising from her move.

RHA's argument finds support in the record. Plaintiff's attorney, Roger Cook, wrote RHA's counsel:

> [F]or the period September 2005 through early March 2006 Ms. Evans rented a unit on the private market in Durham, North Carolina, for which she paid monthly market rent. **Doing so was necessary in order to bring her closer to her job based in Research Triangle Park**. She returned to her prior rental unit owned by Ms. Hutchinson in March 2006 upon learning of the successful outcome of this case: RHA's assistance is not available for a unit located outside of Wake County, and she wishes to resume receiving assistance as soon as possible.

**[DE-47-2, ex. 1, p. 2]** (emphasis added).

In addition, at the hearing, Mr. Cook stated that the convenience of being closer to her job was "a critical factor" in Plaintiff's move. (Tr. 22-23). When asked to explain the discrepancy between the assertion that the move was due to financial reasons and the reason mentioned in the letter, Mr. Cook replied that proximity to her job was not the sole motivation in Plaintiff's moving; it was also

7

related to her concerns about the ability to pay back rent. Id. at 21-24. However, Plaintiff's other attorney, Christopher Graebe, conceded that her Raleigh landlord never requested that she leave the apartment. Id. at 24.

Furthermore, Plaintiff testified "[w]ell, the reason why I moved to Durham was because the case was going on and on and I knew this amount was heaping on top of my head." (Tr. 32). However, she also testified that she relied primarily on advice from friends about affordable housing, without conducting any further inquiry or investigation. Id. at 32-33, 54-55.

| The Court: | One of the reasons you said you moved to Durham is because the apartments were cheaper there. |
|---|---|
| The Witness: | Yes. |
| The Court: | Did you feel that there were no comparably priced at the $815 range in Raleigh that you could have moved to? |
| The Witness: | Well, I just, you know, going by what people were — had said, you know. |

Id. at 54-55.

Based on this record, it is clear that Plaintiff's principal motivation for moving to Durham was convenience, not finances. Therefore, it is RECOMMENDED that the RHA not be required to pay compensatory damages for Plaintiff's rent or subsidy while she resided in Durham.

In addition to housing expenses, Plaintiff also seeks $303.31 in reimbursement for the "costs associated with [her] move to Durham, North Carolina in September 2005 and for her return to Campsite Drive in March 2006 . . . ." **[DE-47, Ex.1, p. 3]**. RHA argues that Plaintiff's moving expenses should be limited to $169.91, the amount Plaintiff paid to move from Durham back to Raleigh. **[DE-47, p. 6]**. The move from Raleigh to Durham was caused by the RHA's wrongful termination of Plaintiff's Section 8 benefits. Accordingly, it is RECOMMENDED that Plaintiff be compensated for the full amount of her moving expenses, $303.31.

8

## II.    Attorney's Fees

In addition to compensatory damages, Plaintiff also requests attorney's fees.  An award of attorney's fees is governed by the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.  This statute was enacted "to establish a fee shifting regime that would enable civil rights plaintiffs to gain effective access to the federal courts." Buffington v. Baltimore County, Maryland, 913 F.2d 113, 129 (4th Cir. 1990).  The Act provides "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Rum Coal Sales v. Caperton, 31 F.3d 169, 174 (4th Cir. 1994) (quoting 42 U.S.C. § 1988).  Although the award is discretionary, the Supreme Court has concluded, "a plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Rum, 31 F.3d at 174 (quoting Hensley v. Eckerhart, 461 U.S. 424, 429 (1983)).

"The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. Adjustments to that fee then may be made as necessary in the particular case." Blum v. Stenson, 465 U.S. 886, 888 (1984) (internal citation omitted).   For example, if the plaintiff did not prevail on all of her claims, then the number can be adjusted downward. Rum, 31 F.3d at 174-75.  In comparison, where the plaintiff obtained complete relief, her attorney should receive "a fully compensatory fee, and in cases of exceptional success, even an enhancement." Id. at 175 (quoting Hensley, 461 U.S. at 435).  However, where cases are overstaffed, and the skills of the attorneys are disproportionate, the number of hours should also be adjusted to delete excessive, duplicative, or unrelated hours. Hensley, 461 U.S. at 434.   Thus, the attorney's fee should only reflect "the product of billing judgment." Rum, 31 F.3d at 175 (quoting Hensley,  461 U.S. at 437) (internal quotations omitted).

To determine whether the number hours expended on a particular case are reasonable, courts are guided by the factors set forth in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974), which were adopted by Congress two years later. <u>Blum</u>, 465 U.S. at 893; 42 U.S.C. § 1988 (1976); S. Rep. No. 94-1011, at 6 (1976). These twelve factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. <u>Johnson</u>, 488 F.2d at 717-19; <u>Hensley</u>, 461 U.S. at 430 n.3.

In addition to the number of hours expended in the case, the hourly rate charged by the attorneys must also be reasonable. <u>Rum</u>, 31 F.3d at 175. The reasonableness requirement is satisfied by "compensating attorneys at the 'prevailing market rates in the relevant community.'" <u>Rum</u>, 31 F.3d at 175 (quoting <u>Blum</u>, 465 U.S. at 895). Because each case is unique, this determination is a fact intensive inquiry that is guided by several factors. <u>Id.</u> For example, the court will consider the fee that the attorney normally charges in comparable cases as well as the rate they actually charged when they have represented the client in the past. <u>Id.</u> In addition, to determine the "prevailing market rate," the court will look to the customary practice of the community in which the case is brought. <u>Id.</u>; <u>Nat'l Wildlife Fed'n v. Hanson</u>, 859 F.2d 313, 317 (4th Cir. 1988). In sum, "a fully compensatory fee will include compensation for all hours *reasonably* expended at market rates in the relevant community . . . . " <u>Rum</u>, 859 F.2d at 175 (emphasis added).

Plaintiff's attorneys request approximately $52,606.00 in attorneys' fees. **[DE-39, Ex. 1]**. Their billing records indicate that a total of 212 hours were expended litigating this case.[7] Plaintiff's counsel also requests $15,270.00 for the 51 hours spent on the evidentiary hearing on compensatory damages and attorney's fees. **[DE-62, Ex.1]**.[8] RHA contests awarding any attorney's fees on the ground that Plaintiff was represented on a *pro bono* basis. **[DE-47, p. 8].** Failing that, it argues in the alternative that if the Court determines that attorney's fees are warranted, "a reasonable award would be far less than the amount sought by Plaintiff." **[DE-47, pgs. 8-9]**. Specifically, the RHA challenges both the hourly rate charged by Plaintiff's counsel as well the number of hours that were expended. Id. at 10-13.

Defendant's first argument, that private *pro bono* counsel are not entitled to attorney's fees, is without merit. The Fourth Circuit has explicitly held that *pro bono* counsel are entitled to attorney's fees, even if they choose to donate the fees to a non-profit organization. See, e.g., Brinn v. Tidewater Transp. Dist. Comm'n, 242 F.3d 227, 234-35 (4th Cir. 2001) (noting that courts have consistently held that "entities providing pro bono representation may receive attorney's fees where appropriate, even though they did not expect payment from the client, and in some cases received public funding"); Tillman v. Wheaton-Haven Recreation Ass'n, 517 F.2d 1141, 1148 (4th Cir. 1975) *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074 (concluding "when an allowance of attorneys' fees is justified, it should be measured by the reasonable value of the lawyer's services. It should not be diminished because the attorney has

---

[7] The total number of hours from Plaintiff's exhibit was approximately 211 hours, 48 minutes [DE-39, Ex. 2]. I rounded up the number to the nearest hour.

[8] After adding up all the hours in Plaintiff's exhibit, the total number of hours was approximately 53.1 hours. [DE-62, Ex. 1].

agreed to contribute the money, in whole or in part, to a civil rights organization whose aims have stimulated him to work voluntarily.").

RHA's remaining objections are addressed in light of the so-called <u>Johnson</u> factors. When determining the appropriate amount for attorney's fees, (4) "the preclusion of other employment by the attorney due to acceptance of the case" or simply stated, lost opportunity costs, must be considered. <u>Rum</u>, 31 F.3d at 175; <u>Daly</u>, 790 F.2d at 1076 n.2. Plaintiff's counsel claims his firm lost opportunities to pursue other work: "[a]ll hours are charged at each attorney's ordinary billable rate at the time, and each of the attorneys was fully engaged and would have been working for other clients but for this action." **[Affidavit of Christopher Graebe, DE-39, p. 3, ¶ 10]**.

Fourth Circuit precedent holds:

> A proper analysis of the question of whether other employment is precluded should consider the extent to which time spent on the case in question precludes the attorneys from engaging in other gainful employment. This *Johnson* factor recognizes that the effect of the case on an attorney's ability to do other potentially lucrative work may in some cases make an upward adjustment of the hourly rate necessary to accomplish full compensation.

<u>Daly v. Hill</u>, 790 F.2d 1071, 1082 n.15. (4th Cir. 1986).

While this case has spanned over three years, it was resolved by a motion for summary judgment, not as the result of protracted litigation. **[DE-32]**. In addition, the billing records indicate that for several months, the attorneys spent less than 8 hours on this case. **[DE-39, Ex. 1]**. Thus, their involvement was not so extensive that it precluded participation in other lucrative work. Therefore, the undersigned RECOMMENDS that there be no upward adjustment to counsels' hourly rates to compensate them for lost opportunity costs.

Plaintiff's attorney also claims that approximately 33.8 hours of research was necessary to litigate this case. **[DE-54, p.9]**. RHA argues that the number of hours is excessive because the

12

underlying issues in this case were neither controversial nor complex. **[DE-47, pgs. 12-13, DE-55, p. 13]**.

In addition to research time, RHA challenges the 38 hours that were spent drafting Plaintiff's eight page complaint, the 31 hours that were spent preparing the motion and memorandum for the preliminary injunction, as well as the 59 hours that were expended preparing the motion for summary judgment. **[DE-55, p. 13]**.[9]  RHA alleges that these hours merely reflect "duplicative work" that was unnecessary to litigate this case.  **[DE-55, p. 13]**.

Notably,"'counsel are not forbidden from receiving fees for background research if the research is (1) relevant and (2) reasonable in terms of the time for the scope and complexity of the litigation.'" <u>Certain v. Potter</u>, 330 F. Supp. 2d 576, 583 (M.D.N.C. 2004) (quoting <u>Spell v. McDaniel</u>, 616 F. Supp. 1069, 1098 (E.D.N.C. 1985) *aff'd in part, vacated in part*, *remanded in part on other grounds*, 824 F.2d 1380 (4th Cir. 1987)).  However, before the court will award a fee, the movant must demonstrate that "experienced,  skilled counsel  have conducted the relevant research in good faith . . . ." <u>Certain</u>, 330 F. Supp. 2d at 583.  In addition, the research and preparation work that a fee applicant requests be billed to his adversary, must reflect sound "billing judgment." <u>See</u> <u>Spell</u>, 616 F. Supp. at 1084 (stating that full compensation to attorneys does not include the time that was *actually* expended; only the time that was *reasonably* expended) (emphasis in original).

 Specifically, the "'[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.'"  <u>Spell</u>, 616 F. Supp. at 1085 (quoting <u>Copeland v. Marshall</u>, 641 F.2d 880, 891 (D.C. Cir. 1980) (emphasis in the original)).

---

[9] In Plaintiff's supplemental brief, her attorney reduced the 25.9 hours spent on preparation for the preliminary injunction to 10 hours at $230 per hour. [DE-54, p. 9].  The result is a $3,450 reduction.  <u>Id.</u>

When taking these factors into account, the court must also be mindful that "[t]he reasonableness of hours expended in a particular case depends upon the complexity of the case, the number of reasonable strategies pursued, and the responses necessitated by the tactics of the opponents." Spell, 616 F. Supp. at 1085. Basically, if a case involves protracted litigation, a higher number of hours to conduct research or perform other tasks may be warranted. Id. However, the court is still required to use its own judgment to assess the appropriate amount of time needed to complete certain activities. Id.

Plaintiff's attorneys, Christopher Graebe and Elaine Whitford, filed affidavits in support of their claim for research hours. These affidavits clearly illustrate part of the problem with the number of hours charged to research -- their belief that only cases in this district should inform their claims and shape their pleadings and arguments. Ms. Whitford avers "[b]ecause this was a case of **first impression in this district** to our knowledge, significant legal research was necessary to fully understand and present the issues to the Court."**[DE-41, ¶ 8]** (emphasis added). Mr. Graebe expresses a similar sentiment, "[t]his was a case of **first impression in this district**." **[DE-39, ¶ 8]** (emphasis added). Notably, there is no affidavit from Plaintiff's third lawyer, Elizabeth LeVan Riley, for whom attorney's fees are also sought. Mr. Graebe mentions her in his affidavit. **[DE-39, ¶ 15]**.

Fourth Circuit law in this area was developed decades ago. In 1970, the circuit recognized that "Goldberg v. Kelly, 397 U.S. 254 (1970) was equally applicable to the hearing to be afforded tenants of public housing before the determination to evict them." Caulder v. Durham Housing Authority, 433 F.2d 998, 1003-04 (4th Cir. 1970), *cert denied.*, 401 U.S. 1003 (1971). In addition, since at least 1973, actions by public housing authorities were held to be under color of law. Joy

v. Daniels, 479 F.2d 1236, 1238-39 (4th Cir. 1973). Furthermore, in Clark v. Alexander, 85 F.3d 146, 150 (4th Cir. 1996), the Fourth Circuit concluded:

> Goldberg places five requirements on the termination process employed by a housing authority: (1) timely notice from the housing authority stating the basis for the proposed termination, (2) an opportunity by the tenant to confront and cross-examine each witness relied on by the housing authority, (3) the right of the tenant to be represented by counsel, (4) a decision, based solely on evidence adduced at the hearing, in which the reasons for the decision are set forth, and (5) an impartial decision maker. Goldberg, 397 U.S. at 266-71; see also Caulder v. Durham Housing Authority, 433 F.2d 998, 1003-04 (4th Cir. 1970), cert. denied, 401 U.S. 1003 (1971) (Goldberg applies to Section 8 terminations). Federal regulations set out the basic procedural requirements of informal hearings in almost literal compliance with Goldberg. 24 C.F.R. § 882.216(b)(6).

Clark, 85 F.3d at 150.

These were the authorities relied on by Judge Boyle in his order granting Plaintiff's Motion for Summary Judgment. **[DE 32, p. 8]**.

Clearly, the questions presented were neither novel nor difficult (2). Given the state of the law, the experience of the attorneys, and the fact that Plaintiff prevailed on a Motion for Summary Judgment, the undersigned finds that the skill required to perform the legal services was ordinary (3).

Accordingly, based on the Johnson factors, the undersigned RECOMMENDS that the number of hours in Plaintiff's fee request be reduced as follows:

(a) An 11 hour reduction for preparation of the original and amended complaint, to a total of five hours.

(b) A 26 hour reduction for research of the section 8/due process issue, to a total of four hours.

(c) A 23 hour reduction for research, and preparation of the memorandum for the preliminary injunction issue, to a total of ten hours.

15

(d) A 59 hour reduction for research, preparation, email/phone conferences, and hearings for the motion for summary judgment, to a total of five hours

## A.    Reasonable Hourly Rate

The hourly rate for attorney's fees is determined by using the prevailing market rate in the community in which the court sits. <u>Rum</u>, 31 F.3d at 178; <u>Blum</u>, 465 U.S. at 895. The "[p]laintiff (through her attorney) bears the burden 'to produce satisfactory evidence – in addition to the attorney's own affidavit – that the requested rate [] [is] in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" <u>Certain</u>, 330 F. Supp. at 589 (quoting <u>Blum</u>, 465 U.S. at 895 n.11).

Plaintiff's attorneys submitted affidavits reporting their standard rates as follows: Elaine Whitford, $215.00 per hour (2003), $230.00 per hour (2004), $255 per hour (2005); Elizabeth Riley, $295.00 per hour (2003); and Christopher Graebe.$300.00 per hour (2005-06). **[DE-40, p. 2]**.[10] In support of these rates, counsel also provided an affidavit from Jonathan Sasser, an attorney who practices complex commercial litigation in Cary, North Carolina. <u>Id.</u> at 1. Mr. Sasser affirmed that he frequently provides *pro bono* representation to "persons of limited means, including in the area of civil rights." <u>Id.</u> at 2. In addition, Mr. Sasser stated that he was familiar with the customary fees charged within the Wake County legal community for representation in *pro bono* civil rights cases. <u>Id.</u> Based on his familiarity, he concluded that the fees charged by Plaintiff's counsel "are within the amount customarily charged by attorneys and legal personnel of like experience and ability for representation in similar civil matters." <u>Id.</u> at 3.

---

[10]  In his affidavit, Mr. Graebe states that although his usual hourly rate is $350 per hour, he is only seeking $300 per hour for the work that he has done in this matter. [DE-62, p. 1].

The RHA challenges the reasonableness of the aforementioned rates on three grounds. **[DE-47, p. 11]**. First, RHA notes that the rates reflect the fee-paying work done for the typical clients represented by Womble, which include corporations, businesses, and universities. Id. Second, RHA contends that the supporting affidavit from Mr. Sasser is "incompetent" evidence to demonstrate that the rates are reasonable because it failed to "show the range of rates charged by attorneys in similar circumstances . . . [n]or did it show one other attorney that received those rates from a client." Id. Third, the RHA suggests that since the Plaintiff is "more similarly situated with indigent defendants whom receive counsel appointed and paid by the United States Government," an appropriate hourly rate would be $90 per hour. Id. at 12.

The undersigned concludes that the evidence submitted by Plaintiff's attorney in support of their rates, does not meet their burden. Rum mandates that the attorney's fee application reflect the rate charged for similar services in similar circumstances. 31 F.3d at 175. However, Plaintiff's counsel did not provide any evidence of the customary fee his firm charges for performing similar services; specifically, civil rights litigation.[11] Instead, he affirmed that "the rates [charged] were the firm's standard rates for the participating attorneys" based on their background and experience. **[DE-39, pgs. 3-4, ¶¶ 11, 15]**. In addition, Mr. Sasser's affidavit failed to indicate whether Plaintiff's counsels' rates are the rates charged for comparable civil rights litigation within the Eastern District of North Carolina, nor did he discuss the attorneys' experience and skill in the relevant practice area.

The Fourth Circuit has held that it will not "mechanically accept" the rates proffered by

---

[11] In affidavits and during the evidentiary hearing, Plaintiff's attorney mentioned that he has handled several cases involving challenging the procedures of the Raleigh Housing Authority on a *pro bono* basis. [DE-39, p.3, ¶ 7]; (Tr. 15-16).

private attorneys "in the absence of more specific corroborating evidence of rates charged for civil rights litigation in the [relevant] community." Buffington, 913 F.2d at 130 (noting that evidence demonstrating hourly rates can be proved by "'affidavits reciting precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market'") (quoting Spell, 824 F.2d at 1402); Trimper, 58 F.3d at 76; cf. Rum, 31 F.3d at 175 (concluding that the rate actually charged by the fee applicant is relevant when the attorney has charged those rates to the clients in the past). Therefore, submitting affidavits that merely reflect the standard rates that Plaintiff's counsel's firm would charge their fee-paying clients does not provide the necessary information to determine the appropriate hourly rate. See Shakopee Mdewakanton Sioux Community v. Prior Lake, 771 F.2d 1153, 1161 (8th Cir. 1985), cert. denied, 475 U.S. 1011 (1986) (stating that in cases where the attorney does not specialize in the particular area of law, using their own billing rates is unreliable).

In addition, the Fourth Circuit has only endorsed a limited justification for awarding high-end hourly rates to seasoned attorneys litigating civil rights cases. Buffington, 913 F.2d at 130.

> The Supreme Court has strongly intimated that the primary justification for awarding high-end hourly rates for experienced counsel in [civil rights] litigation is that their very experience and skill will result in economies of time because of their lack of need for extensive background research. Where, as here, counsel is indeed experienced in general but not in the special field of civil rights litigation, that justification may upon careful analysis be found lacking. Here as a matter of fact the record at least suggests the likelihood that an inordinate amount of legal research effort was necessitated by these undoubtedly fine lawyers' lack of specific experience in this field.

Id. (internal citations omitted).

Ms. Evans's case is similar to Buffington. While Plaintiff's counsel has extensive experience in

complex civil litigation, they lack the requisite background in civil rights litigation.[12] As a result,

Plaintiff's attorneys spent an inordinate amount of time as "part of the preparation [for the case]

learning certain basic principles of civil rights law. . . [and] procedural due process . . . ." **[DE-54,**

**pgs. 6-7]**.  They now request that the RHA compensate them at the standard rates they charge their

fee-paying clients.  However, to allow this result would contravene the purpose behind § 1988. See

Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986) (stating

that the rationale behind the fee-shifting statutes was not intended to replicate exactly the fee an

attorney could earn through a private arrangement with his client).

Accordingly, the undersigned RECOMMENDS that Plaintiff's counsels' hourly rates be

reduced to reflect the circumstances of this case. It is RECOMMENDED that Mr. Graebe be

compensated at the rate of $250.00 per hour, Ms. Riley at the rate of $175.00 per hour, and Ms.

Whitford at the rate of $200.00 per hour.

The remainder of the Johnson factors can be disposed of as follows:(6) the fee is fixed;  (7)

there appears to be no time limitations imposed by the client or the circumstances; (8) The amount

in controversy, even under Plaintiff's theory of damages, was minimal.  Her attorneys vindicated

her constitutional right to due process and obtained an injunction prohibiting the RHA from using

the tainted record to terminate her housing subsidy; (9) the attorneys are by experience, reputation,

and ability, in their areas of expertise, of the highest caliber;  (10) the case was not undesirable; (11)

the attorney's had no prior relationship with their client;  (12) there were no comparable cases

awarding attorney's fees in the district.

---

[12]  As evidenced by supporting exhibits, Mr. Graebe, Ms. Whitford and Ms. Riley primarily concentrate
their practices in employment discrimination and administrative charges for corporations, higher education law,
commercial construction litigation, and business litigation matters. [DE-39-3, Ex. 2, pgs. 2-7].

## B. Lack of Detail in Plaintiff's Counsel's Billing Records

The RHA contends that Plaintiff's counsel fee award should be further reduced to reflect the lack of adequate detail in several billing entries. **[DE-47, pgs. 13-14]**. In general, a fee applicant must describe with specificity the nature of the work that was performed in his or her case. Hensley, 461 U.S. at 437 (stating, "[p]laintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures"); See also Spell, 616 F. Supp. at 1086 (noting "[a]lthough it is not necessary to know 'the exact number of minutes spent nor the precise activity to which each hour was devoted,' the fee application must contain sufficient detail to permit both the Court and opposing counsel to conduct an informed appraisal of the merits of the application") (quoting Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354, 261 (D.D.C. 1983)). To provide guidance, the Fourth Circuit has outlined the appropriate method for maintaining billing records. Fair Hous. Council v. Landow, 999 F.2d 92, 97 (4th Cir. 1993).

> First, the applicant must make every effort to submit time records which specifically allocate the time spent on each claim. Second, those records should attempt to specifically describe the work which the fee applicant allocated to unsuccessful claims so as to assist the district court in determining the reasonableness of the fee request.

Id.

By following this detailed procedure, the fee applicant provides the court with sufficient information to determine the appropriate costs that should be assessed against opposing counsel. Spell, 616 F. Supp. at 1086.

In this case, RHA asserts that Plaintiff's counsel should be disallowed billing time for entries where he did not describe the nature of a conference with co-counsel, as well as five other entries described as "email correspondence" with co-counsel, the client or the witness. **[DE-47, pgs. 13-14]**.

20

The undersigned has reviewed Plaintiff's billing records and finds that several entries lack sufficient detail to adequately reflect the specific nature of their work. Instead, Plaintiff's counsel has grouped numerous entries together making it difficult to discern exactly how much time was spent performing certain tasks. As a result, both parties have cited different numbers for various activities, which makes it difficult to calculate the hours with precision. Therefore, the undersigned RECOMMENDS that in general, the fee award should be reduced to reflect the lack of specificity. These reductions are discussed below. However, the entries cited by the RHA are not so vague that they should be disallowed.

### C. Attorneys' Fees for the Evidentiary Hearings

Plaintiff's counsel also requests an additional $15,270.00 for the 51 hours spent preparing for and appearing at the two-day evidentiary hearings on damages and attorney fees. **[DE-62, p. 2]**.[13]

In paragraph 5 of his supplemental affidavit, Plaintiff's attorney notes that he only seeks reimbursement for time between August 1, 2007 and October 25, 2007. **[DE-62, p. 2].** He did not include in the 51 hours ". . . any time for preparation of evidence on the issue of attorney fees and . . . only a small amount of time for preparation and argument on the entitlement of attorney fees." **[DE-62, p. 2, ¶ 3]**.

In response, the RHA concedes that Plaintiff's counsel is entitled to additional attorney's fees for the evidentiary hearings, but contends that 23.6 of the hours expended were "excessive, duplicative, and unreasonable." **[DE-66, pgs. 2-3]**. In addition, the RHA also argues that Plaintiff's counsel should not be compensated at his standard hourly rate of $300 per hour. **[DE-66, pgs. 4-5]**.

---

[13] Adding the hours set forth in the exhibit in **[DE-62]** yields a total of 53.1 hours.

Instead, RHA renews its argument that "$90.00 an hour is a reasonable rate . . . [because this] is the rate customarily paid on behalf of indigent individuals so that they are provided competent representation in federal court." **[DE-66, p. 5]**.

It is not always clear from the exhibit filed as part of **[DE-62]** which hours are attributable to the compensatory damages issue and which are associated with the claim for attorney fees. It appears, however, that approximately 45 hours are clearly associated with the compensatory damages claim and the remaining 8 hours cannot be separated. Id. The distinction is important.

The number of hours reasonably expended on the issue of damages should be fully compensated. However, while "it is well settled that the time spent defending entitlement to attorney's fees is properly compensable under § 1988 . . . [it is] within the district court's discretion to determine exactly what amount would compensate the party sufficiently for the time spent on the fees phase of a lawsuit." Trimper, 58 F.3d at 77 (internal citation omitted). The court can reduce the award based on the reasonableness of the hours expended and the complexity of the issues. Id. (concluding it was not error for the district court to reduce the amount of additional attorney's fees because Plaintiff's counsel "devoted an inordinate amount of time and expense in seeking attorney's fees. . . ."). Finally, the Supreme Court has also admonished that "[a] request for attorney's fees should not result in a second major litigation." Hensley, 461 U.S. at 437.

Turning first to the time spent on compensatory damages, 1.5 hours are claimed for "work on" the affidavits of Roger Cook and Mary Ella Hutchinson. **[DE-62, Ex. 1]**. An additional 2.4 hours are claimed for a telephone conference with Ms. Hutchinson, work on the supplemental affidavit of Mr. Cook, to receive and review additional documents from Hutchinson, draft notice of availability and file, and begin work on a supplemental brief. Id. Mr. Cook represented Plaintiff

prior to the case being filed in this court and is listed as counsel in this case. He was directed by the court to submit an affidavit on whether Ms. Hutchinson "demanded" payment from the Plaintiff and if so, in what amount. **[DE-48]**.

The hours that cannot be disaggregated in the billing records should not be allowed. Accordingly it is RECOMMENDED that the 2.4 hours for the telephone conference, work on the supplemental affidavit of Mr. Cook, to receive and review additional documents from Hutchinson, draft notice of availability and file, and begin work on a supplemental brief be disallowed. It is further RECOMMENDED that 5.5 of the15 hours claimed for the three entries that group together: the evidentiary hearing preparation, work on damages and attorney's fees, receiving and reviewing documents, and the assembly of exhibits be disallowed.[14]

Likewise, it is RECOMMENDED that 1.5 hours be disallowed for the preparation of Mr. Cook's and Ms. Hutchinson's affidavit. Had Mr. Cook answered the question posed by the undersigned, "Have you received a demand from [Ms. Hutchinson] for payment of an amount certain,"[Tr. 98], the 1.5 hours spent to "work on" the Cook and Hutchinson affidavits would not have been required. Notably, Mr. Cook is an experienced attorney who should not have needed help to draft an affidavit on such a simple and discrete issue.

Moreover, the undersigned finds that 5.6 hours of the 16.1 hours appearing on page two of Exhibit 1 of **[DE-62]** were not "reasonably expended." Accordingly, it is RECOMMENDED that these hours be disallowed. As a result of the forgoing recommendations, Plaintiff's counsel should be awarded $9,525.00 for the 38.1 hours reasonably expended for the work on the evidentiary

---

[14] See [DE-62, Ex. 1, p. 1] entries: 2.9 for significant hearing preparation, including work on damages, preparation of argument, etc.; 3.6 for significant hearing preparation, including work on brief and assembly of exhibits; 8.5 for extensive preparation for evidentiary hearing, including drafting direct examinations, etc.

23

hearings.

## III. Costs

Federal Rule of Civil Procedure 54(d) (1) provides: "[e]xcept when express provision therefore is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs . . . ." As a result, the court has the discretion to award the prevailing party costs associated with litigating its case. Flint v. Haynes, 651 F.2d 970, 973 (4th Cir. 1981), *cert. denied*, 454 U.S. 1151 (1982). Generally, costs will include reasonable litigation expenses such as "secretarial costs, copying, telephone costs, and necessary travel" as well as any other expenses that would normally be charged to a fee-paying client during the course of representation. Trimper v. City of Norfolk, 58 F.3d 68, 75 (4th Cir. 1995), *cert. denied*, 516 U.S. 997 (1995); See also Certain, 330 F. Supp. 2d at 591-92; Spell, 852 F.2d at 771. However, although costs are usually awarded as a matter of course, the court, in its discretion, may disallow costs that are not adequately documented. Trimper, 58 F.3d at 77.

Here, the costs are documented and reasonable. Accordingly, the undersigned RECOMMENDS that costs in the amount of $1,881.29 be allowed. **[DE-38 & 61]**.

## IV. Prejudgment Interest

The parties disagree as to the propriety of awarding prejudgment interest and to the method of calculating the interest if awarded. Plaintiff requests that prejudgment interest be awarded and points to three sources that the Court can utilize to calculate the interest rate: the North Carolina legal rate of interest, which is fixed at 8%, the prime rate, which is 7.75%, or the federal post-judgment rate computed under 28 U.S.C. § 1961, which was 4.11%. **[DE-54, p. 1]**. Not surprisingly,

Plaintiff asserts that the North Carolina interest rate is the most appropriate in this case because of the "outrageousness of the violation and the intentional, continued withholding of the amount Defendant has already conceded was due." **[DE-54, p. 2]**.

In contrast, RHA argues that Plaintiff is not entitled to an award of prejudgment interest because it will result in a windfall. **[DE-55, p. 10]**. Specifically, RHA contends that since the purpose of prejudgment interest is to compensate parties for "the loss of use of their funds," Plaintiff is not entitled to this interest because she has failed to prove that she was required to pay any out of pocket expenses as the result of the termination of her housing subsidy. **[DE-55, p. 10]**. Alternatively, the RHA suggests that if the Court does award prejudgment interest, it should be calculated pursuant to 28 U.S.C. § 1961. Id.

42 U.S.C. § 1983 does not address awarding prejudgment interest to injured parties. Thus, "when a statute is silent, the issue of prejudgment interest is committed to the sound discretion of the trial court . . . ." Coliseum Cartage Co. v. Rubbermaid Statesville, Inc., 975 F.2d 1022, 1026 (4th Cir. 1992). The purpose of prejudgment interest is to make the injured party whole by affording them complete recovery. See, e.g., West Virginia v. United States, 479 U.S. 305, 311 (1987) (stating that prejudgment interest allows full compensation by awarding parties "the loss of use of money due as damages from the time the claim accrues until judgment is entered"). However, although it awards parties an additional measure of damages, "[p]rejudgment interest is not intended to be punitive in nature . . . ." Scearce v. Halifax County, No. 94-0020-D, 1995 U.S. Dist. LEXIS 9176, at *4 (W.D.Va. May 26, 1995) *aff'd in part*, *rev'd in part*, *remanded by* 1996 U.S. App. LEXIS 23280 (4th Cir. Sept. 5, 1996); Cotter v. E. Conference of Teamsters Retirement Plan, 898 F.2d 424, 429 (4th Cir. 1990).

In general, prejudgment interest should be awarded absent sufficient justification. <u>Cotter</u>, 898 F.2d at 429. Although some courts calculate interest based on the rates set by state law, "[f]ederal law controls the issuance of prejudgment interest awarded on federal claims." <u>Fox v. Fox</u>, 167 F.3d 880, 884 (4th Cir. 1999). However, because there is no federal statute setting the rate of prejudgment interest, it is appropriate to use the federal post-judgment interest statute, 28 U.S.C. § 1961, to determine the proper rate. <u>Fed. Deposit Ins. Corp. v. British Am. Corp.</u>, 755 F. Supp. 1314, 1328 (E.D.N.C. 1991). All interest awarded "shall be compounded annually." <u>Fed. Deposit</u>, 755 F. Supp. at 1328 (quoting § 1961 (b)).

To recap, the undersigned RECOMMENDS that Plaintiff be awarded $303.31 in compensatory damages, that prejudgment interest be set under the terms of 28 U.S.C. § 1961, and that the interest be compounded annually. It is further RECOMMENDED that costs in the amount of $1,881.29 be allowed and that Plaintiff's counsel be awarded a total of $28,295.00 in attorney's fees based on the following:

(a) five hours for preparation of the original and amended complaint at $200 per hour for a total of $975.[15]

(b) four hours for research of the section eight /due process issues at $200 per hour for a total of $775. [16]

---

[15] Most of the work done on the complaint was completed by Elaine Whitford. Her hourly rate was reduced to $200 per hour. However, Ms. Riley spent 1 hour on a draft of the complaint, and her hourly rate was reduced to $175 per hour. Therefore, I multiplied 4 hours at $200, plus $175 for the additional hour to reflect the work done by both attorneys.

[16] Again, although Ms. Whitford performed the bulk of the research, Ms. Riley also contributed 1.5 hours.

(c) ten hours for research, and preparation of the memorandum for the preliminary injunction issue at $200 per hour for a total of $2,000.

(d) five hours for research, preparation, email/phone conferences, hearings for the motion for summary judgment at $200 per hour for a total of $1,000.

The remaining hours for which counsel seeks payment, 10.1 hours for reviewing updates in the case materials, 48.3 hours for discovery and settlement negotiations, and 10.4 hours for email correspondence, telephone conferences and meetings with the client, witnesses and co-counsel were "reasonably expended" to prosecute this case to a successful resolution. Therefore, the undersigned RECOMMENDS that these 68.8 hours be compensated at the hourly rates determined above. This would result in a fee award of $18,770.00. The total fee award RECOMMENDED by the undersigned, which includes both fee requests, is $28,295.00.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 28th day of November, 2007.

_____
William A. Webb
U.S. Magistrate Judge