IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:04-CV-291-FL

| | |
|---|---|
| MICHELLE EVANS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HOUSING AUTHORITY OF THE )<br>CITY OF RALEIGH, N.C., )<br>)<br>Defendant. ) | ORDER |

In this action, initiated by complaint filed May 4, 2004, by plaintiff, a recipient of housing benefits, against defendant, a federally funded public housing authority ("PHA"), plaintiff sought declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and redress pursuant to 42 U.S.C. § 1983, as a result of defendant's decision to terminate assistance to plaintiff. On January 28, 2006, United States District Court Judge Terrence W. Boyle resolved in favor of plaintiff crossmotions for summary judgment. The court found that hearing failed to comport with constitutional due process requirements and applicable housing regulations. The court ordered defendant to reinstate plaintiff's housing benefits, and enjoined defendant from terminating benefits on the basis of the established record. In its order, the court deferred consideration of compensatory damages for loss of benefits from and after November 1, 2003, pursuant to 42 U.S.C. § 1983, and costs, and attorneys' fees, pending further hearing by the court.

Hearing was not undertaken, however, before December 8, 2006, when the case was reassigned. Notice of reassignment inadvertently was delayed by the clerk of court who did not refer

the case for the court's consideration until August 2007. Evidentiary hearing on damages was set before the magistrate judge pursuant to the court's order entered August 16, 2007. Thereafter, Magistrate Judge William A. Webb recommended to the court in memorandum and recommendation filed November 28, 2007, that defendant pay Three Hundred Three and 31/100 Dollars ($303.31) in compensatory damages for certain of plaintiff's moving costs, court costs in the amount of One Thousand Eight Hundred Eighty-One and 29/100 Dollars ($1,881.29), and attorneys' fees in the amount of Twenty-Eight Thousand Two Hundred Ninety-Five and No/100 Dollars ($28,295.00). The magistrate judge also addressed award of prejudgment interest. Plaintiff timely objected only to the amount of compensatory damages recommended.

For reasons stated below, the court awards nominal damages in the amount of One and No/100 Dollar ($1.00), court costs totaling One Thousand Nine Hundred Seventy-Five and 10/100 Dollars ($1,975.10), and attorneys' fees in the amount recommended by the magistrate judge.

## FINDINGS OF FACT

This section of the order necessarily includes discussion about the housing assistance program at issue to provide context for the particular facts found bearing on the issue of damages in the case. Section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974 ("Section 8"), provides rental housing assistance to low-income families. Congress created the program for the purpose of assisting low-income families in finding "a decent place to live." 42 U.S.C. § 1437f(a). Congress authorized the Secretary of Housing and Urban Development ("HUD") to enter into contracts with PHAs and to fund such agencies through annual contributions contracts, for the purpose of providing program participants with rent subsidies. 42 U.S.C. § 1437f(b).

2

After a Section 8 participant locates a prospective landlord, a proposed lease between the applicant and the landlord is reviewed by the local PHA. If the lease between the landlord and the participant is in compliance with federal regulations, the landlord then enters into a Housing Assistance Payments contract ("HAP contract") with the PHA.

Pursuant to the HAP contract, a monthly housing assistance payment is made directly to the landlord in an amount representing the difference between the agreed monthly rental rate and the portion of that rate to be paid as rent by the Section 8 participant. The payment is not made to the tenant; rather, the payment is owed by the PHA to the landlord. Part B of the HAP contract, paragraph 7(a)(1), provides, in relevant part, that "[d]uring the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family . . ." The HAP contract automatically terminates, as set forth in paragraph 4(b)(2), of Part B, if assistance is terminated to the family.

Part C of the HAP contract is the "Tenancy Addendum." This part of the HAP contract comes directly into the lease agreement by its terms, where pursuant to paragraph 2(a) of the Tenancy Addendum, the terms of the lease agreement include the Tenancy Addendum.[1]

Of particular import to the court's analysis are those parts of the Tenancy Addendum that address requirements of continued residency; reiterate the family's responsibility for payment of any unsubsidized rent portion; provide that the PHA will make its payment directly to the landlord; state that the family is not responsible for paying any part of the PHA's share of the rent; and recite the impact on the lease of any discontinuation of program assistance. These provisions, part of the lease

---

[1] Pursuant to paragraph 2(b), "[i]f there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control."

3

agreement entered into by plaintiff with L & M Realty & Investment Properties, specifically read as follows:

\*\*\*

3.  Use of Contract Unit

a.  During the lease term, the family will reside in the contract unit with assistance under the voucher program.

\*\*\*

5.  Family Payment to Owner

a.  The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b.  Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA.

c.  The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d.  The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

\*\*\*

9. Lease: Relation to HAP Contract

   If the HAP contract terminates for any reason, the lease terminates automatically.

10. PHA Termination of Assistance

    The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

\*\*\*

Benefits earlier were paid on plaintiff's behalf and circumstances bearing on that earlier relationship, which unfolded while plaintiff later was a tenant of L & M Realty & Investment Properties, and led to her termination of benefits by defendant. She was a recipient of a federal housing subsidy under Section 8, when plaintiff moved into a Raleigh, North Carolina residence, located at 1512 Rock Drive ("the Rock Drive residence"), owned by Glenda Daniel, on August 1, 2002, pursuant to a lease agreement entered into between plaintiff and Ms. Daniel, and a HAP contract entered into by defendant and Ms. Daniel, for a one-year term. Defendant committed to provide a substantial portion of the One Thousand One Hundred Seventy-Five and No/100 Dollars ($1,175.00) monthly rental payment. In July 2003, with authorization of defendant, where difficulties in the landlord-tenant relationship had arisen, plaintiff vacated the Rock Drive residence.

On July 18, 2003, plaintiff entered into a one-year lease agreement commencing by its terms July 18, 2003, with L & M Realty & Investment Properties, through its authorized agent, Mary Ella Hutchinson, for a residence located at 7400 Campsite Drive in Wendell ("the Campsite residence"), near Raleigh, in Wake County, North Carolina. Plaintiff's lease agreement, again predicated upon

housing assistance being provided by defendant, established a monthly rental rate of One Thousand One Hundred Four and No/100 Dollars ($1,104.00). The HAP contract was entered into September 17, 2003, and by its terms, began on the first day of the initial term of the lease agreement, which it referred to on its face as August 1, 2003.[2]

In accordance with established program procedures, as a part of the process of defining the respective liabilities of plaintiff and defendant under the lease agreement, on September 5, 2003, defendant issued a rent adjustment and payment notification to plaintiff for the Campsite residence, with copy to the landlord. The notification, which by its terms also was made a part of the lease agreement, established in this instance that plaintiff would owe on a monthly basis the sum of Thirty-Five and No/100 Dollars ($35.00) and defendant would pay the difference or One Thousand Sixty-Nine and No/100 Dollars ($1,069.00) per month. The rent adjustment and payment notification provided "[t]his notice is presented to you in accordance with the terms and conditions of your lease agreement; therefore, this notice shall be attached to and be made a part of your lease." The notification also expressly provided that "[a]ll other covenants, terms and conditions of the lease remain the same except as to the monthly rental which is adjusted as herein stated."

Therefore, under the Tenancy Addendum to the HAP contract, and pursuant to the rent adjustment and payment notification, both of which were incorporated into the terms of the lease agreement, that agreement was modified to provide that plaintiff would pay only the sum of Thirty-Five and No/100 Dollars ($35.00) per month to her landlord, and defendant would pay the remaining balance of One Thousand Sixty-Nine and No/100 Dollars ($1,069.00) per month. The HAP contract

---

[2] The apparent inconsistency in start date of the lease term raises no issue for decision, where it is undisputed that defendant paid under the HAP contract all amounts due and owing by it up to and until October 31, 2003.

6

with L & M Realty & Investment Properties, through its authorized agent, Ms. Hutchinson, and the lease agreement entered into by plaintiff with the landlord, were for a standard duration of one year. There is a provision in the form lease agreement for a month-to-month tenancy upon expiration of the lease term.

Plaintiff had been living at the Campsite residence for several months when she was illegally terminated from the program for reasons more particularly set forth in the court's order on summary judgment. Defendant informed plaintiff by letter dated September 25, 2003, that her housing assistance would be terminated due to violations under the Section 8 program, effective October 31, 2003. Defendant's letter recited that plaintiff would have an opportunity to "appeal" the "decision" during an "informal hearing." The letter, copied to plaintiff's landlord, also represented to plaintiff that "[s]hould you choose to remain in occupancy after the effective date of your termination, you will be responsible for paying the full amount of rent to the owner." After hearing October 16, 2003, written decision issued October 22, 2003, also copied to plaintiff's landlord, which affirmed the "termination of [plaintiff's] assistance," and stated that "[i]f you wish to remain in your current unit after October 31, 2003, you will be responsible for paying the full contract rent."

After the illegal termination of her Section 8 benefits, plaintiff continued to live at the Campsite residence from November 1, 2003, until she moved from the residence of her own volition September 17, 2005, to Durham, in Durham County, North Carolina, where she lived in an apartment until April 17, 2006. On April 17, 2006, she moved back into and occupied again the Campsite residence. On June 12, 2006, she left voluntarily, and thereafter plaintiff lived in a variety of locations until July 13, 2006. Prior to her second departure, she confirmed with defendant that by leaving the Campsite residence, where she no longer wished to reside, she would not jeopardize

7

her subsidy status.

On July 13, 2006, she moved into subsidized housing upon receipt of her Section 8 benefits, premised upon a new calculation of benefits which required her to make monthly payments to the new landlord, United Real Estate & Investments, LLC., in the amount of Two Hundred Eighty-Seven and No/100 Dollars ($287.00) on a total monthly rent of Nine Hundred Ninety-Five and No/100 Dollars ($995.00), with defendant paying the difference under a new HAP contract to United Real Estate & Investments, LLC.

Over two years after the date of the termination, it was decided that the same was not legal, and a half a year later, plaintiff's benefits were reinstated. Re-certification procedures necessarily would have been a part of the continuation of plaintiff's benefits for this extended period, as the magistrate judge noted in footnote 1 of the memorandum and recommendation. Plaintiff's financial wherewithal improved during the pendency of the action, and, while she still qualified for a housing subsidy, upon reinstatement in 2006 she was notified by defendant of her responsibility to pay a rent portion approximately eight times greater than what she originally was assessed by defendant as the family's rent share in 2003.

For the entire time she lived at the Campsite residence, she was not asked to pay more than Thirty-Five and No/100 Dollars ($35.00) per month, nor was she bound legally to pay more. At her March 29, 2005 deposition, when asked how plaintiff and L & M Realty & Investment Properties, through its agent, Ms. Hutchinson, arrived at that Thirty-Five and No/100 Dollars ($35.00) figure to continue to be paid from and after November 1, 2003, plaintiff affirmed that she and Ms. Hutchinson "talk[ed] about that and [] agreed on it." More particularly, "[s]he just told me to continue to pay what I would have normally paid . . . until this situation is cleared up," plaintiff

8

testified. Plaintiff, when asked the question "[d]id [Ms. Hutchinson] tell you that at some point you are going to have to repay the monies if this lawsuit is not successful?" responded "[n]o, she didn't tell me that."

Ms. Hutchinson also testified by affidavit earlier in the case that she never demanded payment from plaintiff. As a part of this written testimony, plaintiff introduced a statement of indebtedness, including rent and late charges, prepared by Ms. Hutchinson and forwarded directly to plaintiff's attorney, Roger Cook, staff attorney at Legal Aid of North Carolina, Inc., dated March 24, 2005, which purports to reflect total sums then due the landlord of or relating to plaintiff's tenancy. The writing prepared in litigation reveals on its face certain inconsistencies. It makes reference to amounts variously owing by January 12, 2004, for rent accruing between October 2003 and January 2004, and by March 24, 2005, for rent accruing between February 2004 and March 2005. The writing appears to reflect that in March 2005, the landlord ceased collecting from plaintiff the monthly sum of Thirty-Five and No/100 Dollars ($35.00).

At hearing before the magistrate judge September 27, 2007, when asked "[o]ther than the lease, did you sign any agreements with Ms. Hutchinson or her entity that owned the [Campsite residence]?," plaintiff responded, "No." Plaintiff affirmed that "there was no agreement to pay the full $1,104.00 per month." Instead, plaintiff testified, "the agreement was that once the case was over . . . whether I win or whether I lose, I am responsible to pay if I lose . . . I would be responsible for the rent." The landlord's agent testified at hearing that she could tell plaintiff was very concerned about being able to pay, and that "[s]he said she didn't know how she could do it if the court didn't rule in her favor. She didn't think she could do it."

At the hearing, Ms. Hutchinson also testified to a verbal agreement with plaintiff that she

9

would live in the residence and pay only the sum of Thirty-Five and No/100 Dollars ($35.00) per month, and that this agreement persisted while no payment was being made by defendant pursuant to its termination of plaintiff's benefits. When asked, "[w]hat was your understanding with regard to the $1,069 that nobody was paying while the decision was under review," she answered "[t]hat at some time it would be – it would be due and payable."

Any reliance on the writing generated in litigation, sent by Ms. Hutchinson to plaintiff's attorney, as evidencing the indebtedness of plaintiff on the full amount provided as rent in the July 18, 2003, lease agreement, would be misplaced under the circumstances here. Reliance on defendant's letter dated September 25, 2003, that plaintiff's housing assistance would be terminated due to violations under the Section 8 program, effective October 31, 2003, which recited that "[s]hould you choose to remain in occupancy after the effective date of your termination, you will be responsible for paying the full amount of rent to the owner," or the written decision issued October 22, 2003, also copied to plaintiff's landlord, which affirmed the "termination of [plaintiff's] assistance," and stated that "[i]f you wish to remain in your current unit after October 31, 2003, you will be responsible for paying the full contract rent," similarly would be misplaced. These writings do not establish under the facts presented any agreement between plaintiff and her landlord for plaintiff to assume payment of the full amount owing under the lease agreement which terminated October 31, 2003, or separate agreement obligating plaintiff personally for the same amount going forward.

At the September 27, 2007 hearing, plaintiff testified, consistent with prior testimony of record, that the verbal agreement for plaintiff to pay Thirty-Five and No/100 Dollars ($35.00) per month to the landlord was not altered over time. It is undisputed that no formal demand ever was

10

made by or on behalf of L & M Realty and Investment Properties on plaintiff for any amount. Plaintiff's counsel makes reference to a good Samaritan in the form of Ms. Hutchinson. Through her sympathetic actions she sought to provide continuing relief to plaintiff. When asked "[w]hy did you allow [plaintiff] to only pay $35 a month as her share while the decision was under review?", she testified:

> Because I knew what she was going through. Excuse me. I am a little bit emotional. I knew what she was going through. I knew what I had just witnessed by the housing authority was one of the most horrible things I have ever seen.
>
> I went through the hearing process with her. I knew what she had been through with the previous landlord. I knew everything that was going on, you know. We talked about a lot of things. We shared a lot of things, and I knew how bad this was on her.
>
> And at that point in my mind, I am thinking this is wrong, this will some day be corrected, and I am going to hang in there with her until it is.

On September 17, 2005, plaintiff moved from the Campsite residence to Durham, North Carolina. Plaintiff incurred Three Hundred Three and 31/100 Dollars ($303.31) in costs associated with her move to Durham and later return to the Campsite residence, after entry of the court's order on summary judgment, where she resided for a brief period, until June 12, 2006.

The magistrate judge has recommended finding that when defendant terminated plaintiff's housing subsidy on October 31, 2003, then, pursuant to the HAP contract, plaintiff's lease with her landlord automatically terminated. Thus, plaintiff and her landlord's obligations under the lease ceased, and no compensatory damages are due of or relating to any obligation owing the landlord. The magistrate judge's recommendations as to costs and attorneys fees are not disputed. Rather,

11

plaintiff objects to recommendations concerning compensatory damages.

Most fundamentally, plaintiff objects to the recommendation that she receive no compensation for the period of time from November 1, 2003 through September 17, 2005. Additionally, plaintiff objects to the recommendation that defendant not be required to pay compensatory damages for plaintiff's rent or subsidy while she resided in Durham. Finally, plaintiff objects to the court's recommendation that she not receive compensatory damages from the time when she returned to Wake County until restoration of her voucher.

## DISCUSSION

A judge may accept, reject, or modify, in whole or in part, the findings or recommendations by the magistrate judge. 28 U.S.C. § 636(b)(1)(C). The district court shall make a *de novo* inquiry into the portions of the memorandum and recommendation to which specific objections are made. Id. 28 U.S.C. § 636(b)(1)(C). "In the absence of objections, the district court is not required to explain its reasons for adopting the report." Farmer v. McBride, 177 Fed.Appx. 327, 331 (4th Cir. 2006) (unpublished case) (citing Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983).

A.  Damages

The court's order on summary judgment found the "basic tenants of fairness embodied in the Due Process Clause [of the United States Constitution] [we]re absent" where the termination hearing was conducted by an official found not to be "an impartial decision maker." Concerning damages, the court now must determine what actual harm was suffered by plaintiff due to this violation.

Section 1983 creates "a species of tort liability," Piphus, 435 U.S. at 253, and, therefore, "when §1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." Stachura, 477

12

U.S. at 306. See also Stachura, 477 U.S. 299, 309-10 (1986) ("[w]hatever the constitutional basis for §1983 liability, such damages must always be designed to compensate injuries caused by the [constitutional] deprivation"). While "[d]eterrence is . . . an important purpose of [§ 1983] . . . it operates through the mechanism of damages that are compensatory – damages grounded in determinations of plaintiffs' actual losses." Id. at 307.

Actual damages, as opposed to nominal damages, should be awarded "only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights." Carey v. Piphus, 435 U.S. 247, 254 (1978). Actual injury means "actual damages sustained." Doe v. Chao, 306 F.3d 170, 183 (4th Cir. 2002). The Fourth Circuit holds that "[a]t common law, tort damages were designed to provide compensation for the injury caused to plaintiff by defendant's breach of duty." Randall v. Prince George's Co., Md., 302 F.3d 188, 204 (4th Cir. 2002). "The concept of actual injury at common law is a broad one," id., and the United States Supreme Court holds that "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . . , personal humiliation, and mental anguish and suffering." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986). Where the claim is for emotional distress, evidence must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." Randall, 302 F.3d at 209.

The Supreme Court's decision in Carey v. Piphus, 435 U.S. 247, 254 (1978), "obligates a court to award nominal damages when a plaintiff establishes the violation of [a constitutional right] but cannot prove actual injury." Farrar v. Hobby, 506 U.S. 103, 112 (1992). See also Williams v. Griffin, 952 F.2d 820, 825 n. 2 (4th Cir. 1991) ("in the absence of a showing of actual injury,

13

[plaintiff] would still be entitled to nominal damages upon proof of a constitutional violation"). "A plaintiff's failure to prove compensatory damages results in nominal damages, typically one dollar." Price v. City of Charlotte, N.C., 93 F.3d 1241, 1246 (4th Cir. 1996) (citing Piphus, 435 U.S. at 266). Although this sum does not represent a significant financial victory for the plaintiff, "the law recognizes the importance to organized society that those rights [certain "absolute" rights that are not shown to have caused actual injury] be scrupulously observed." Piphus, 435 U.S. at 266.

Plaintiff argues that the proper measure of compensatory damages is the housing subsidy at date of termination multiplied by the number of months of subsidy deprivation. As plaintiff's benefits were terminated October 31, 2003, she calculates the total amount of damages, from November 1, 2003, until July 11, 2006 premised on loss of the landlord's share of rent due to be paid under the HAP contract and applicable lease agreement to L & M Realty & Investment Properties totaling the sum of Thirty-Four Thousand Five Hundred Ninety-Five and 65/100 Dollars ($34,595.65). This calculation is derived by taking the One Thousand Sixty-Nine and No/100 Dollars ($1,069.00) per month that defendant would have paid directly to plaintiff's landlord under the 2003 HAP contract and one-year lease agreement at issue, including the September 5, 2003 rent adjustment and payment notification, making this amount a constant factor, and then multiplying it by the intervening thirty-two (32) months and eleven (11) days.

Plaintiff argues that, although she paid no more than a monthly rent rate of Thirty-Five and No/100 Dollars ($35.00) after the termination, the amount of the total subsidy cannot be considered a windfall because she currently owes that amount to her landlord. Plaintiff argues that each month in which she paid the subsidized rate, she accrued One Thousand Sixty-Nine and No/100 Dollars ($1,069.00) in debt to the landlord. Plaintiff's argument rests on a faulty proposition, that the lease

14

agreement remained in effect after defendant terminated her voucher, and thereunder she is liable to the landlord. This is not correct.

Under paragraph 4(b)(2) of Part B of the HAP contract, the HAP contract terminated automatically when defendant terminated program assistance to plaintiff. Under paragraph 9 of the Tenancy Addendum, a part of the lease, where the HAP contract terminates "for any reason, the lease terminates automatically." "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." Walton v. City of Raleigh, 342 N.C. 879, 881 (1996) (citation omitted). Therefore, "[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean." Hartford Accident & Indem. Co. v. Hood, 226 N.C. 706, 710 (1946) (internal citations omitted). See also Lane v. Scarborough, 284 N.C. 407, 411 (1973) ("When a contract is in writing and free from any ambiguity which would require resort to extrinsic evidence, or the consideration of disputed fact, the intention of the parties is a question of law. The court determines the effect of their agreement by declaring its legal meaning.")

When plaintiff's termination occurred, the lease between plaintiff and L & M Realty & Investment terminated, as well, effective October 31, 2003. Plaintiff focuses on the word "void" used in conclusion of the order on summary judgment to attempt to resuscitate the lease agreement and put the parties and the landlord back operating under the HAP contract and the one-year lease agreement, for nearly three years, for purposes of the damages calculation. This has appeal, surely, because of the very sympathetic Ms. Hutchinson, and the fact that plaintiff was allowed by her to stay at the Campsite residence for however long she wanted. But the voiding of the decision to terminate plaintiff's benefit does not make operative the previously terminated lease agreement even

15

though the landlord allowed plaintiff to continue to enjoy the use and benefit of the premises for Thirty-Five and No/100 Dollars ($35.00) per month. That concession on the part of the landlord does not make defendant liable now under the lease agreement for defendant's share of the rent due the landlord, nor does it make plaintiff liable for defendant's share of the rent under that agreement, as plaintiff implicitly argues.

The hold-over theory espoused by plaintiff requires a rewrite of the lease agreement not supported in law or in fact. The Tenancy Addendum and the notification, earlier discussed, capping plaintiff's liability at Thirty-Five and No/100 Dollars ($35.00) per month, have to drop out as lease terms under this theory to recast the one-year lease agreement, predicated on a housing subsidy payable directly to the landlord, as subjecting plaintiff now to liability for all amounts owing on a month-to-month basis. The hold-over provision, which addresses extension of a contract term fully satisfied, which it was not here, then must be read to subject plaintiff to monthly liability for the sum of One Thousand One Hundred Four and No/100 Dollars ($1,104.00) for each month she remained on premises. Plaintiff offers no support in law for this interpretation, and the established facts support the opposite, that if plaintiff had any liability under the written lease agreement to the landlord, from and after November 1, 2003, it was only for that monthly payment of Thirty-Five and No/100 Dollars ($35.00).

Defendant's admonitions in its September 2003 termination letter and October 2003 termination decision do not create or sustain liability on plaintiff's part. The greater weight of the evidence is that both plaintiff and the landlord looked to defendant as the source of any additional rent to be paid in the course of their dealings throughout a several year period. While settlement of this suit between plaintiff and defendant certainly could have resulted in some payment terms

favorable to the landlord if agreed to by the parties in negotiated resolution, the issue, as presented here now for decision by this court, is plaintiff's damages, not whether L & M Realty & Investment Properties should recover from defendant.

If plaintiff sustained actual damages, she should recover them. But plaintiff had use and benefit of the Campsite residence during a time period extending far outside the fixed term of the HAP contract and lease agreement for the Campsite residence, for the sum of Thirty-Five and No/100 Dollars ($35.00) per month which, if the lease agreement had been in effect throughout, under the provisions current when it was terminated in November 1, 2003, would have corresponded to her monthly rent portion. Plaintiff is entitled to recover her actual loss, not the actual loss of another. While worried about the money her landlord lost by allowing her to stay on premises, plaintiff has not demonstrated actual injury to herself from time of wrongful termination through September 17, 2005, when she left the Campsite residence on her own.

While plaintiff would be entitled to no subsidy upon an unapproved move to Durham, in Durham County, from her residence in Wendell, in Wake County, had she then been receiving a housing subsidy, on September 17, 2005, she left the Campsite residence for reasons of her convenience pursuant to the greater weight of the evidence. Plaintiff cannot recover for payment of rent while in Durham, under the circumstances presented, either.

On April 17, 2006, she moved back into the Campsite residence, until June 12, 2006. Where the kindly landlord assessed no more than a monthly sum of Thirty-Five and No/100 Dollars ($35.00) in rent, the same analysis set forth above applies, as well, to plaintiff's 2006 return to the Campsite residence. There are no actual damages for this period which are attributable to the illegal termination of her housing subsidy.

17

Case 5:04-cv-00291-FL   Document 71   Filed 06/25/08   Page 17 of 20

favorable to the landlord if agreed to by the parties in negotiated resolution, the issue, as presented here now for decision by this court, is plaintiff's damages, not whether L & M Realty & Investment Properties should recover from defendant.

If plaintiff sustained actual damages, she should recover them. But plaintiff had use and benefit of the Campsite residence during a time period extending far outside the fixed term of the HAP contract and lease agreement for the Campsite residence, for the sum of Thirty-Five and No/100 Dollars ($35.00) per month which, if the lease agreement had been in effect throughout, under the provisions current when it was terminated in November 1, 2003, would have corresponded to her monthly rent portion. Plaintiff is entitled to recover her actual loss, not the actual loss of another. While worried about the money her landlord lost by allowing her to stay on premises, plaintiff has not demonstrated actual injury to herself from time of wrongful termination through September 17, 2005, when she left the Campsite residence on her own.

While plaintiff would be entitled to no subsidy upon an unapproved move to Durham, in Durham County, from her residence in Wendell, in Wake County, had she then been receiving a housing subsidy, on September 17, 2005, she left the Campsite residence for reasons of her convenience pursuant to the greater weight of the evidence. Plaintiff cannot recover for payment of rent while in Durham, under the circumstances presented, either.

On April 17, 2006, she moved back into the Campsite residence, until June 12, 2006. Where the kindly landlord assessed no more than a monthly sum of Thirty-Five and No/100 Dollars ($35.00) in rent, the same analysis set forth above applies, as well, to plaintiff's 2006 return to the Campsite residence. There are no actual damages for this period which are attributable to the illegal termination of her housing subsidy.

After June 12, 2006, she lived in a variety of locations, including with family, until July 13, 2006. While she left the Campsite residence a second time of her own accord, as noted, even if she could be found eligible to recover damages for this period, evidence bearing on actual rental costs has not been submitted for the month between her departure a second time from the Campsite residence and July 13, 2006, when plaintiff moved into subsidized housing upon receipt of her Section 8 benefits. Her receipt of benefits was premised upon a new calculation of benefits which required her to make monthly payments to the new landlord of the sum of Two Hundred Eighty-Seven and No/100 Dollars ($287.00). Why it took as long as it did for defendant to renew her housing subsidy in accordance with the court's order on summary judgment does not reveal itself in the record, but plaintiff has proved no damages suffered by her during this time period attributable to the termination of benefits or delay in reinstatement.

The magistrate judge recommended damages be paid limited to costs incurred in moving from the Campsite residence to Durham and back again, to which defendant does not object. The court finds no evidence of moving costs in the record for her second move out of the Campsite residence. Under the theory applied by the magistrate judge, these costs, if proved, also would be recoverable as damages. The court declines to adopt this aspect of the recommendation where both moves were for the convenience of plaintiff, not due to the illegal termination of benefits years' earlier or upon any insistence then of the landlord. Accordingly, plaintiff cannot under law recover any moving costs.

There are no actual damages proven under the unique circumstances of this case on the record before this court. In the absence of this showing, where constitutional violation has occurred, nominal damages are appropriately awarded in the amount of One and No/100 Dollar ($1.00).

18

B.  Costs

After hearing, plaintiff made several filings related to costs, which the docket records incorrectly as pending motions. These are supplemental bills of costs (DE ## 61, 65), which were tendered before entry of the memorandum and recommendation. The scope of the magistrate judge's recommendation did not include address of DE # 65, however. The magistrate judge recommended allowance of the original bill lodged on the docket at DE # 38, and also of the first supplemental one at DE # 61, for a total of One Thousand Eight Hundred Eighty-One and 29/100 Dollars ($1,881.29). There is no objection to this aspect of his recommendation. The court adopts this recommendation, modified, however, to include allowance on the same basis also of the second supplemental bill (DE # 65). The court herein awards costs totaling One Thousand Nine Hundred Seventy-Five and 10/100 Dollars ($1,975.10).

D.  Attorneys' Fees

The court turns its attention in conclusion to the matter of fees. This was the subject of a large part of the magistrate judge's memorandum and recommendation, which carefully parses the record on fees. There being no objection to the proposed award, and after its own considered assessment, the court awards fees in the total amount of Twenty-Eight Thousand Two Hundred Ninety-Five and No/100 Dollars ($28,295.00), as recommended by the magistrate judge.

CONCLUSION

For the reasons set forth above, it is ORDERED that plaintiff is awarded nominal damages in the amount of One and No/100 Dollar ($1.00), costs in the amount of One Thousand Nine Hundred Seventy-Five and 10/100 Dollars ($1,975.10), and plaintiff's counsel awarded a total of Twenty-Eight Thousand Two Hundred Ninety-Five and No/100 Dollars ($28,295.00) in attorneys'

fees. The clerk of court is directed to close the case.

SO ORDERED, this the 24th day of June, 2008.

_____
LOUISE W. FLANAGAN
Chief United States District Judge